Cite as 2026 Ark. App. 217

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CR-25-90

| | | |
|---|---|---|
| RONALD SPRINGER | | Opinion Delivered April 8, 2026 |
| | APPELLANT | |
| | | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CR-03-280] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE ROBIN F. GREEN, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

**BART F. VIRDEN, Judge**

Ronald Springer appeals the circuit court's denial of his petition to terminate his obligation to register as a sex offender. We affirm.

I. *Relevant Facts*

Springer pleaded guilty to sexual indecency with a child, and the plea was entered October 3, 2003. On December 22, after a sixty-day commitment, Springer was released on probation for three years. Springer registered as a sex offender as ordered, and in 2006, he underwent a Sex Offender Community Notification Assessment (SOCNA). The Sex Offender Assessment Committee (Committee) assigned Springer a Level 3 community-notification status. Springer challenged the assessment, and the circuit court upheld the Committee's decision.

On February 26, 2020, Springer filed a petition to terminate the registration requirement. The petition was not addressed by the court.

In July 2021, Springer underwent a new SOCNA. The 2021 SOCNA report includes the initial 2006 SOCNA report's description of the events that led to his conviction. The 2006 report sets forth that in 2002, MV reported that her father, Springer, masturbated in front of her. She stated that it happened when she and Springer were watching television together after her mother and her brothers had gone to bed. The furniture in their living room was arranged such that MV and her father were visible to each other when this happened. She described multiple instances during which Springer masturbated in her presence. Each time Springer wore a robe that was open, except once when he wore elastic-waist pants that he pulled down. In the interview, MV described in detail Springer's sexual act as well as the appearance of his penis. MV also disclosed that on two occasions, when Springer was rubbing Ben-Gay on her sore legs he put his finger under her shorts and underwear and rubbed around her genital area without penetrating her labia or vagina. MV told her mother, Kay, that her father masturbated in front of her five times, the most recent time being within the last two to three weeks. Kay confronted Springer, and he initially claimed that around five months earlier, MV had walked in on him while he was masturbating, and the exposure was not intentional. A few days later, Springer disclosed to a mental-health-assessment officer that he masturbated where he knew MV could see him, and he believed that he had a sex addiction. Springer reported that he began thinking of his

daughter in a sexual way when she was around age eleven, which is when he and Kay began teaching MV about sex. He explained that MV "had begun to turn into a woman."

The 2006 SOCNA report also included the "OFFENDER VERSION" of the events. Springer stated to the assessor that he began offending against MV when she walked in on him while he was masturbating in the bathroom, and this was probably a triggering event. He began looking on the internet for advice on how to talk to children about sex. Springer explained that he ignored advice not to volunteer information "and focused on the articles that said what he wanted them to say in order to justify the sex act." Springer admitted to wearing loose-fitting pants he could pull down and a robe "so that it would fall open."

In the 2021 SOCNA report, Springer explained that he never thought of MV in a sexual way, and "if he was being honest, he didn't like her very well." He later clarified that he did not like her defiant behavior, but he had sexually objectified her. He described an instance in which he intentionally masturbated in MV's presence, though he did not know why he did it. Springer explained that "he just wanted to educate MV and felt his behavior was an act of anger because she was invading his space." He claimed he only masturbated in front of MV one time, though she had seen him naked more than once because he left the bathroom door open. He told the interviewer that if his treatment records included his statement that he exposed himself to MV five times and that she was the object of sexual fantasy and ritual, he had been "trying to please them and 'give them what they wanted.'" Springer denied that he touched MV around her vagina and claimed he never had any sexual contact with her.

3

The 2006 SOCNA report also included his 1996 conviction for indecent exposure when he "stood on his head" so that two housekeepers could see his penis. He explained that he found the women attractive and wore his robe when he exposed himself so that he could claim it was an accident. Springer was arrested in 1997 for sexual solicitation of a child when he asked a sixteen-year-old girl if she wanted to see his penis. Springer denied exposing himself to the girl but admitted that he "took advantage of a situation." The charge was nolle prossed. In his 2021 account of the event, he admitted that he exposed himself and had worn a robe to facilitate the exposure.

The 2021 SOCNA report also included an account of Springer's 1995 arrest for first-degree sexual abuse. In that incident, he placed an ad in the paper stating that he was a photographer and was searching for models. Twenty-year-old "M" and her roommate contracted with him to pose for photographs. M reported that during one shoot, she posed both nude and in lingerie. Springer videotaped the photo session and afterward showed M a video of him masturbating. He then asked her to touch his penis. M reported that she was afraid because the door was locked, he was bigger than she, and he yelled at her. She refused to touch him and told him that he was making her uncomfortable; eventually, however, Springer intimidated her enough that she gave him a "hand job," which he videotaped. During the police investigation that followed, officers found "hundreds" of photographs of children taken in his home, though none were explicit in nature. None of the photos included adults. Eventually, the officers convinced Springer to "give up the hidden items," which included several other photography contracts with other potential victims. Springer

claimed to have destroyed the video of M in which he sexually assaulted her, though officers later intercepted him as he left an acquaintance's house with a box of what he later admitted were pornographic videotapes. When officers watched the specific video related to M's allegations, "it was clear the video was spliced," and the portion of the video in which M claimed to have been sexually assaulted had been removed. Springer admitted that he placed the ads soliciting models to pose for photographs for sexual purposes; however, he denied that he intimidated M, and he claimed the sexual act was consensual.

The 2021 report also included Springer's 2003 statement made during psychological treatment that when he was between ten and twelve years old, his mother bought him pornographic materials, and she watched him masturbate while she was partially nude. In his 2021 assessment, Springer explained that he did not consider his mother's behavior sexual abuse, though it was "wrong." Initially, Springer stated that pornography was a trigger for him, and he avoided "movies, films, etc. with nudity and sex scenes to date" and did not "seek out pornography." Springer later admitted that he still viewed pornography; however, he found it boring. He stated that he did not keep a pornography collection because he was afraid he would get caught, though he did have "half a dozen" magazines in the house. He denied ever being sexually attracted to girls younger than sixteen. Springer reported using alcohol and marijuana and experimenting with acid when he was in high school. Springer denied being under the influence of drugs or alcohol when he committed the offense against his daughter. He recalled that he was taking Prozac at the time of the offense, which he had heard lowered inhibitions, though he did not think the Prozac caused him to commit the

offense. He explained that in 2003 before he appeared in court on the sexual-indecency charge, he underwent and successfully completed inpatient sex-offender treatment. The report issued at the end of his treatment declared he was a normal heterosexual male. Springer's psychiatrist, who provided mental healthcare after the inpatient treatment, wrote a letter stating that Springer did not present a danger to others. In Springer's treatment documents, a clinician concluded that Springer did not meet the criteria for an exhibitionist or a pedophile, and his behavior was related to sexual compulsion. At the time of the 2021 assessment, Springer was no longer in a twelve-step program for sex addiction. At the conclusion of the assessment, Springer was assigned Level 3 status.

On April 24, 2024, Springer filed a second petition to terminate his obligation to register as a sex offender.

The hearing on the petition took place on October 19. Springer testified that because he had difficulty finding a job postconviction, he started his own successful lawncare business. Eventually he sold that business and used the money to buy an online auto parts business. Springer explained that in the twenty-one years since his release, there had been no allegations against him, and he had not incurred criminal charges of any kind. Springer testified that before his appearance in court on the sexual-indecency charge, he spent three months in Denton, Texas, at the Sange Center for Healing where he completed an inpatient program for sex addiction. After he completed the program, he was released to the care of Martin Faitak, a psychologist whom he saw on a weekly basis for "years." Faitak released Springer from care and opined that Springer was no longer a threat to the community.

Springer stated that he had been involved in a twelve-step program for "a very, very long time" and considered himself in recovery. He stated that he took no chances and did not go places he should not be. When he did leave home without his wife, he went straight to the grocery store or auto parts store and straight home. He had never been unsupervised with his granddaughter "for my protection and hers." Springer wanted his registration obligation terminated so that he could travel with his wife. The State argued that due to Springer's 2006 and 2021 Level 3 assessment, his obligation to register should not be terminated.

From the bench, the court described the 2021 SOCNA as "a litany of allegations and other improper behavior" including Springer's history of exposing himself to a minor female neighbor and housekeepers, soliciting women to pose for him, and inappropriate behavior that followed. Counsel informed the court that these incidents were all before 2003, as early as 1996 and 1997, and the related charges were nolle prossed. The court responded, "Which shows that it's not just an isolated incident." Springer assured the court that after years of diligent work, he had no desire to expose himself to anyone. The court noted that in the 2021 SOCNA, he reported alcohol, marijuana, and hallucinogen use but denied drug use during the commission of the offense. Springer explained that he was in high school when he used alcohol and marijuana, and he never used acid. Springer testified that he had changed the "very nature of who [he is]." He explained that he had gone through tough times—the death of his parents and his wife's breast cancer—without returning to his old behavior.

The court noted his diagnoses of depression, "bipolar," PTSD, and anxiety and his prescribed antidepressant and antianxiety meds. The court described the 2021 SOCNA report as a "Dateline episode on steroids here of – of the history, the perversion." The court noted that since his release, Springer bought a used car without permission, and there were "a number of opportunities the State could have pursued for failure to comply with sex offender registration and reporting requirements contained within this assessment report."

The circuit court ruled from the bench that Springer's petition was denied and entered the order denying his request on October 28. Springer timely filed his notice of appeal.

## II. *Discussion*

### A. Standard of Review and Applicable Law

We review the circuit court's findings regarding a petition filed pursuant to Ark. Code Ann. § 12-12-919(b)(2)(B) (Supp. 2025) under a clearly-erroneous standard of review. *Stow v. State*, 2016 Ark. App. 84, at 3, 482 S.W.3d 752, 753. A finding is clearly erroneous when, although there is evidence to support it, we are left with the definite and firm conviction that a mistake was made. *Id.*

The circuit court is not required to believe the testimony of any witness, including the self-serving testimony of the accused. *Collins v. State*, 2014 Ark. App. 574, at 4, 446 S.W.3d 199, 203. It is the province of the circuit court to determine the credibility of witnesses. *Welch v. State*, 364 Ark. 324, 219 S.W.3d 156 (2005).

Arkansas Code Annotated section 12-12-919(b)(2) provides that

[t]he court shall grant an order terminating the obligation to register upon proof by a preponderance of the evidence that:

      (A) The applicant, for a period of fifteen (15) years after the applicant was released from prison or other institution or placed on parole, post-release supervision, supervised release, or probation has not been adjudicated guilty of a sex offense; and

(B) The applicant is not likely to pose a threat to the safety of others.

## B. Points on Appeal

1. *Whether Arkansas Code Annotated section 12-12-919(b)(2)(B) is ambiguous*

Springer argues that the lack of detail in Ark. Code Ann. § 12-12-919(b)(2)(B) creates an ambiguity "regarding the time frame from which the court should choose the factors."

Questions of statutory construction and application are reviewed de novo because it is for the appellate courts to decide the meaning of a statute. *Krol v. State*, 2018 Ark. App. 512, at 6, 563 S.W.3d 586, 589. We adhere to the basic rule of statutory construction, which is to give effect to the intent of the legislature. *Id.* We construe the statute just as it reads, giving the words their ordinary and usually accepted meaning in common language, and if the language of the statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion to resort to rules of statutory interpretation. *Id.*

Springer asserts that because of the ambiguity of the language in Ark. Code Ann. § 12-12-919(b)(2)(B), two issues arise when a court attempts to apply it: (1) whether the circuit court is permitted to consider only a petitioner's behavior *prior* to being adjudicated guilty of a sex offense; and (2) whether the circuit court is relegated to considering only the petitioner's behavior *postconviction*. Springer contends that "the General Assembly intended

9

Ark. Code Ann. § 12-12-919(b)(2)(B) to require a circuit court to determine whether the petitioner still poses the same risk as when adjudicated guilty of a sex offense; thus, a circuit court cannot base findings regarding potential risk to the community on conduct or accusations predating the petitioner's initial adjudication."

We disagree with Springer's assertion that Ark. Code Ann. § 12-12-919(b)(2)(B) is ambiguous, and we hold that the plain language of the statute conveys a clear and definite meaning. Specifically, subdivision (b)(2)(B) allows the court to consider evidence that the petitioner is not likely to pose a threat to the safety of others. The legislature chose not to put a time constraint on subdivision (b)(2)(B), and any other reading of the plain language of the statute is a strained interpretation. Moreover, Springer interprets the legislative intent behind Ark. Code Ann. § 12-12-919(b)(2)(B) as focusing on the circuit court's decision-making process and the evidence it can consider, concluding that a circuit court cannot "base findings regarding potential risk to the community on conduct or accusations predating the petitioner's initial adjudication." We disagree with Springer's contention. The legislative intent behind the Sex Offender Registration Act of 1997, codified at Ark. Code Ann. § 12-12-902 (Repl. 2016), is to protect the community and reflects the court's broad discretion in ascertaining whether the petitioner is likely to reoffend:

> The General Assembly finds that sex offenders pose a high risk of reoffending after release from custody, that protecting the public from sex offenders is a primary governmental interest, that the privacy interest of persons adjudicated guilty of sex offenses is less important than the government's interest in public safety, and that the release of certain information about sex offenders to criminal justice agencies and the general public will assist in protecting the public safety.

Additionally, our caselaw supports the circuit courts' broad discretion in determining whether a petitioner is unlikely to pose a risk to the community. In *State v. Khabeer*, 2014 Ark. 107, at 4–5, this court affirmed the circuit court's decision to terminate the petitioner's obligation to register as a sex offender, holding that

> Appellee emphasizes his testimony that it had been twenty-three years since the crime to which he pleaded guilty had occurred, and that, although he was in the eleventh grade at the time he was arrested, he was only twelve or thirteen years of age at the time he was alleged to have raped or sexually assaulted his then eight-year-old niece. He also testified that he had pleaded guilty, not necessarily because he felt responsibility for the crime, but because his mother asked him to and because he noticed the incident was taking a toll on his mother.

In deciding to terminate Khabeer's registration requirement, the circuit court considered factors that occurred before Khabeer's adjudication. Springer asserts that a court's discretion to consider preconviction circumstances all but removes the pathway for sex offenders who no longer pose a risk to the community to have their obligation to register removed. *Khabeer* proves the opposite is true: the court relied on the petitioner's preconviction conduct in determining that the petitioner no longer posed a risk to the community and terminated his obligation to register.

Springer poses several arguments regarding statutory interpretation; however, because we hold that Ark. Code Ann. § 12-12-919(b)(2)(B) is unambiguous, we need not address them here. *Krol*, *supra*.

2. *The circuit court's finding that Springer likely posed a threat to the safety of others*

For his second point on appeal, Springer argues that the circuit court's determination that he likely posed a risk to the community is clearly erroneous. We disagree and affirm.

11

Arkansas Code Annotated section 12-12-919(b)(2)(B) requires an applicant seeking to terminate his obligation to register as a sex offender to prove, by a preponderance of the evidence, that he or she is not likely to pose a threat to the safety of others. We will not overturn a circuit court's denial of a motion to terminate an appellant's obligation to register as a sex offender unless the circuit court's decision was clearly erroneous. *Francisco v. State*, 2020 Ark. App. 397, at 5, 608 S.W.3d 628, 631. A finding is clearly erroneous when, although there is evidence to support it, after reviewing the entire evidence, the court is left with the definite and firm conviction that a mistake was made. *Id.*

The circuit court considered Springer's preconviction history of sexual offenses and determined that it demonstrated that the 2003 crime to which Springer pleaded guilty was not an isolated incident. The court found that Springer bought a vehicle without asking permission or reporting the purchase. The court relied heavily on the 2021 SOCNA report, which included what the court described as "a Dateline episode on steroids here of – of the history, the perversion." In the 2021 report, the assessor notes that Springer's 2006 account of the events that led to his conviction is notably different than his version of events in his 2021 assessment. In the 2006 report, Springer stated that he masturbated in front of his eleven-year-old daughter between five and six times and admitted that he intentionally masturbated where he knew she could see him. In 2006, Springer stated that he began thinking of his daughter in a sexual way when she was around eleven years old when "she had begun to turn into a woman." Contrastingly, in the 2021 assessment, Springer claimed he masturbated in front of her only one time, he never thought of MV in a sexual way, and

"he just wanted to educate MV and felt his behavior was an act of anger because she was invading his space." Springer denied that he touched MV around her vagina, and he claimed he never had any sexual contact with her. In his 2021 assessment, Springer downplayed his culpability and told the 2021 assessor that in 2006 he was "just trying to please them and 'give them what they wanted.'" Pursuant to the 2021 SOCNA report, Springer was designated a Level 3 threat to the community, which had not changed from his original 2006 assessment. Level 3 sex offenders typically have a history of repeat sexual offending, and/or strong antisocial, violent, or predatory personality characteristics. *Sex Offender Assessment Comm. v. Sera*, 2023 Ark. App. 239, at 6, 666 S.W.3d 862, 866. These are individuals whose offense and criminal history require notification throughout the community. *Id.*

The circuit court is not required to believe the self-serving testimony of any witness. *Scantling v. State*, 2017 Ark. App. 564, at 6. The circuit court clearly did not believe Springer's testimony that he was no longer a threat to the community. Our longstanding rule is that it is the province of the circuit court to determine the credibility of witnesses. *Id.* Accordingly, we affirm.

Affirmed.

GLADWIN and THYER, JJ., agree.

*Lion Legal Services*, by: *Kathryn Loyd Wilson*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jason Michael Johnson*, Ass't Att'y Gen., for appellee.